Filed 10/8/20  Certified for Publication 10/16/20 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SAN DIEGO,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>P.B.,<br><br>    Defendant and Respondent;<br><br>L.C.,<br><br>    Defendant and Appellant. | D075690<br><br><br>(Super. Ct. No. DN143198) |

APPEAL from an order of the Superior Court of San Diego County, Pennie K. McLaughlin, Commissioner.  Reversed in part and remanded with instructions.

Law Offices of David C. Beavans and John T. Sylvester for Defendant and Appellant.

No appearance for Defendant and Respondent.

L.C. (Mother) appeals from a final order of child support covering periods from 2014 to 2019, when Child turned 18. One of the components of the statewide guideline formula for calculating child support is the "approximate percentage of time that the high earner has or will have primary physical responsibility" for the child (Fam. Code, § 4055, subd. (b)(1)(D)), commonly referred to as "timeshare."[1] Mother contends the trial court's child support order must be reversed because the court calculated child support utilizing a 29 percent timeshare for P.B. (Father) during a period of time when Father had no visitation with the child, purportedly due to Mother's interference with Father's visitation rights. Mother also challenges the court's failure to include certain payments Father received from his parents as income available for child support. We agree with Mother's first contention—that it was improper to attribute nonexistent timeshare in response to Mother's alleged interference with visitation—and conclude the order must be reversed so that support can be recalculated based on Father's actual timeshare during the disputed time period, consistent with the statutory guideline under sections 4050-4076. In all other respects, the order is affirmed.

FACTS

Mother and Father were married in 1998, and Child was born in September 2001. In 2006, Mother filed for dissolution of marriage. The parties have been embroiled in litigation ever since. Child resides with Mother, but both parents share joint legal custody of Child. At some point the County of San Diego began child support enforcement in the matter, and since then, all child support matters were held in the Family Support

---

[1]    All statutory citations are to the Family Code.

2

Division of the superior court, while child custody matters remained in family court before different judicial officers.

In 2011, an incident at a restaurant resulted in Father's visitation being reduced from an equal timeshare of 50 percent to supervised visitation only. During the time period from October 2014 through July 2015, Father's parenting time resulted in an average timeshare of 29 percent.

In September 2014, Mother filed a motion seeking modification of child support payable by Father and a determination of arrears.[2] While the parties continued to litigate custody disputes, Mother's motion was repeatedly continued.

In October 2015, a counselor with Family Court Services (FCS) prepared a report in connection with the parent's custody dispute. The counselor's report reflected that Mother "claimed the child fears the father and does not want to have anything to do with him." Mother recalled the 2011 incident that she claimed caused the child to be fearful of Father. Father told the counselor Mother had made multiple false accusations against him. The counselor noted the Child "recalled events from his early childhood about his father's poor parenting, abuse of him, etc. When asked if he actually remembers these events, he stated he did not, but his mother had told him about them." The counselor described Child as "emotionally stunted" and opined that "the child is not able to psychologically see himself as a separate person from his mother." The counselor noted that Child "does not want to see his father" and Child "views the incident at [the restaurant] as total validation of the mother's conceptualization of the father. This incident may have been the father's biggest mistake. However, even if the . . . incident had not happened, the child would have had to find some

---

[2] Mother's motion does not appear in the record on appeal.

3

other reason to reinforce his (mother's) view of the father." The counselor opined reunification therapy would be unsuccessful if Child had no desire to reunify. The counselor recommended joint legal custody with Mother retaining full physical custody and Father having no parenting time at this time.

In September 2016, the parties entered a stipulation regarding "custody and timeshare." The stipulation indicated that Father had "no timeshare of [Child] for approximately the past year." The parties stipulated that Child and Father would commence reunification therapy immediately, with sessions to occur twice per week. After 60 days of reunification therapy, Father's parenting time (and associated timeshare) would increase to 50 percent, unless opposed by minor's counsel or the reunification therapist based on Child's best interests. The parties agreed the stipulation was a final order pursuant to *Montenegro v. Diaz*, requiring a "significant change of circumstances" to modify the order. (See *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 256.) The parties stipulated that "[a]ll custody claims and allegations of either side in the family law case are hereby considered resolved as of signing this stipulation."

Despite the stipulation, reunification therapy did not go as planned. At a hearing on child support in January 2017, the parties explained to the court that, when Child was scheduled to meet for his first therapy session with Father, Child refused to attend and threatened suicide. Instead of attending the session, Child was taken to the hospital for evaluation. Father's attorney indicated Father had filed in the family law action a motion "to switch custody and to eliminate the mom completely," averring that Child had been " 'brainwashed' " by Mother, a "restrictive gatekeeper" who would "go to no end to keep this child away from the dad." The court declined to make any

4

findings regarding Mother's role in Child's estrangement from Father, noting a full hearing on the issue would be required. Father's attorney argued that child support should be calculated based on a 50 percent timeshare because that had been the parties' agreement, and it was solely Mother's fault that this timeshare was never achieved. Father's attorney further argued that Father "has had contact with [Child]"; he had been participating in "therapeutic visitation" with Child over the past 12 months, and as such was entitled to timeshare reflecting that visitation. Nonetheless, the court indicated it would use a zero percent timeshare for Father in an interim support order. The court remarked, "If there is a finding that there was interference by mother, that would allow me to use other timeshares," but in the absence of any such finding, the court must calculate support based on the statutory guideline. Applying the zero percent timeshare, the court set an interim monthly support amount of $819, "reserving back to October 1, 2014."

In March 2017, Father submitted a declaration averring that Mother interfered with Father's visitation time and failed to support Father and Child's reunification therapy.

The parties appeared before the court for a hearing on child support issues again in May 2017. Effective January 1, 2017, the court determined the parties had roughly equal incomes, applied a 50-50 timeshare, and set the interim monthly support amount at zero. The court stated that this interim support order was based on allegations raised in the custody dispute before the family court, which the court stated presented "as a case of alienation and interference of custody and visitation." The court noted its order was not final and was made without prejudice, "because if [the family court judge] reaches a different conclusion based upon the evidence that I have just

5

considered, I will certainly readdress these issues then." The court stated that it was "using the timeshare that the parties should have been out [*sic*]" and stated its findings were made under section 4057, as application of the guideline support formula without modification " 'would be unjust or inappropriate due to special circumstances in this case.' "[3] The court described the following special circumstances: "[T]here was an agreement for visitation; there was an agreement and a stipulation for reunification. . . . [T]o have one party ignore it or specifically interfere with it and then seek child support based on a change in timeshare would be [inequitable]." The court referenced *In re Marriage of Popenhager* (1979) 99 Cal.App.3d 514 (*Popenhager*), noting, " 'he who seeks equity may not take advantage of his wrong,' " and concluded, "under [section] 4057, this would fall under a very limited application of a special circumstance due to Mother's failure to comply with court-ordered reunification efforts."[4]

[3]    Section 4057 provides that the amount of child support established by the uniform guideline formula is presumed to be the correct amount of child support to be ordered. (§ 4057, subd. (a).) The presumption may be rebutted by evidence showing application of the formula would be unjust or inappropriate due to special circumstances in the particular case. (*Id.*, subd. (b)(5).) The court must find the existence of special circumstances by a preponderance of the evidence, and must state in writing or on the record specific information set forth in section 4056 (§ 4057, subd. (b)), including the amount of support that would have been ordered under the guideline formula and the reasons the ordered amount of support differs from the guideline formula amount. (*In re Marriage of Williams* (2007) 150 Cal.App.4th 1221, 1234.)

[4]    In *Popenhager*, the court rejected husband's claim he was entitled to equitable relief from paying child support arrearages because wife denied him visitation rights. (*Popenhager, supra,* 99 Cal.App.3d at p. 523.) If the trial court was relying on *Popenhager* to award Father a higher timeshare as a matter of equity, based on Mother's interference with his visitation rights, the trial court erred for reasons discussed *post*.

6

Mother objected, citing section 3556, and arguing "support shouldn't be set at zero because of the visitation and custody being what it is, regardless of any perceived refusal by the custodial parent implementing rights to visitation."[5]

The parties next appeared for a child support hearing in September 2017. They informed the court the custody litigation remained ongoing in family court. Mother informed the court that Father and Child were continuing conjoint therapy but that Child refused to go on visitation with Father. The court made updated, interim support orders. For the time period October 2014 through July 2015, the court used a timeshare of 29 percent—which represented an average for this time—and set child support at $286 per month.[6] For the time period of August 2015 through December 2016, the court utilized a two percent timeshare and set child support at $817 per month. The court noted that it "made [timeshare] two percent because there were some therapy sessions, and I think [F]ather should be given credit for that." For the time period January 2017 forward, the court applied a two percent timeshare and set child support at $892 per month. The court also set a monthly arrears payment of $200 effective October 2017.

---

[5]     Section 3556 provides, "The existence or enforcement of a duty of support owed by a noncustodial parent for the support of a minor child is not affected by a failure or refusal by the custodial parent to implement any rights as to custody or visitation granted by a court to the noncustodial parent."

[6]     Mother does not dispute this time period on appeal. The court later explained that the 29 percent timeshare was derived from Mother's filing dated January 12, 2017 (which does not appear in the record) in which Mother "laid out all of the visitation in a chart."

The parties appeared for a custody hearing in family court in December 2018. At the hearing, the court observed this was "a tragic case" and bemoaned the case's tortured procedural history and the failure of the courts and the parents to resolve the issues between Father and Child. The court recounted that Father's last regularly scheduled visitation with Child ended in August 2015, and, outside of a few joint therapy visits, Father "had very little contact with [Child]" and had "only attempted to contact [Child] once in the previous year when he mailed [him] a birthday card." The court observed that Child was now 17 years old, and "there is no more time." The court declined to modify custody, finding that it was not in the child's best interest and there was no change in circumstance warranting modification of the parties' September 15, 2016 stipulation. The court observed that, "in some sense," Mother "might have caused a rif[t] in the father/[child] relationship," but that Father could have contributed to the deterioration in their relationship as well.

The court found that Child "was estranged from his Father," but it was "unclear whether the estrangement was caused by intentional actions by Mother." The court found there was no evidence of concealment and emphasized that estrangement was not a defense to paying child support, telling Father, "You still owe the support because child support is for the benefit of [Child]. . . . [I]t flows to [Child], not to Mother." The court concluded that "[t]he parties shall share joint legal custody. The child shall reside primarily with Mother, and visitation with Father shall be as mutually agreed upon by [Child] and the Father."

Following the family court's disposition of the custody issues, the parties appeared before the court for a final evidentiary hearing regarding child support. The court acknowledged the findings made by the judge in the

8

family court proceedings. However, the court commented the evidence indicated that Mother "put into play much of the conduct that resulted in the feelings . . . that led to . . . the estrangement [between father and son] that we see." Father argued that special circumstances existed to rebut application of the presumptive child support guideline and urged the court to apply the "special circumstances" provision of section 4057: "the mother's interference with the visitation is the reason why the timeshare is the way it is. And that's [section] 4057. That's special circumstances."

On January 18, 2019, the court entered a final child support order. For the time period October 1, 2014 through July 31, 2015, the court left in place the child support order made on September 29, 2017, applying a 29 percent timeshare and setting child support at $286 per month. For the time period August 1, 2015 through December 31, 2016—during which time the court acknowledged Father had no visitation with Child—the court utilized a timeshare for Father of 29 percent and entered a child support order of $529 per month. For the time period January 1, 2017 through October 31, 2017— again, during which Father had no visitation with Child—the court utilized a timeshare for Father of 29 percent and entered a child support order of $649 per month. For the time period of November 1, 2017 "going forward," the court utilized the "actual" timeshare for Father of zero percent and entered a child support order of $970 per month.

With respect to the applicable timeshare percentages, the court made the following comments:

> "For the period of 11-1-17 through the present, and for the ongoing order, the Court . . . changes timeshare to [zero percent] based upon the fact that it has been some time since Father has spent any time with [Child]. For the earlier time periods, the Court made a finding of 29 [percent] for the time period of 8-1-15 through 10-31-17

9

over Mother's objection due to the review of substantial evidence of Mother's earlier interference in [Child's] relationship with his Father. The court found this to be an unusual case and that to deprive Father of this amount of timeshare and to award Mother's specific behaviors that contributed greatly to the estrangement, balanced against the needs of [Child] in setting this order for months that have long passed, finds that it is appropriate and just to set the timeshare at 29 [percent]. The Court is mindful that visitation was limited during this time period, and in spite of the parties having come to an agreement on a way forward to reunite Father and [Child] through conjoint therapy."[7]

Regarding the downward adjustment of the timeshare from 29 percent to zero applicable to the November 2017 period and going forward, the court noted that it "is mindful yet of Mother's conduct and Father's perceived lack of effort to bridge the wide divide that has resulted between the Father and [Child]. On balance, and with the recognition as detailed by the family court of [Child's] maturing age, the Court sets timeshare to the actual amount of [zero]."

DISCUSSION

I.

*Timeshare Determination*

Mother challenges the court's calculation of child support using a 29 percent timeshare for the period of time between August 2015 through October 2017, when Father's actual timeshare was zero (or nearly zero).[8] We

---

[7] The court further noted that "conjoint therapy ended in October of 2017 when Mother sent Child to the appointment with an armed security guard, the presence of whom was not acceptable to the therapist."

[8] Father previously contended he was entitled to some modicum of timeshare reflecting his participation in "therapeutic visitation" during some of this time.

10

agree and reverse the child support order so that the court can recalculate guideline child support using Father's actual timeshare during this time period.

We review child support awards for abuse of discretion. (*In re Marriage of Simpson* (1992) 4 Cal.4th 225, 234 (*Simpson*); *In re Marriage of Macilwaine* (2018) 26 Cal.App.5th 514, 527.) "We review factual findings regarding a child support award for substantial evidence. [Citations.] That review requires us to consider the record in a light most favorable to the respondent, and to presume the existence of every fact that reasonably could be deduced from the evidence." (*S.P. v. F.G.* (2016) 4 Cal.App.5th 921, 934 (*S.P.*).) Even in the absence of a responding brief by Father, we adhere to the requirement that the appellant affirmatively demonstrate prejudicial error. (*County of Lake v. Antoni* (1993) 18 Cal.App.4th 1102, 1104.)

Section 4055 sets forth the "statewide uniform guideline" for determining child support. Under the guideline, child support obligations are divided "among the parents based on income and amount of time spent with the child by each parent." (§ 4052.5.) The amount of child support established by the uniform guideline formula is presumed to be the correct amount of child support to be ordered. (§ 4057, subd. (a).) The court may deviate from the presumptively correct guideline and order a different amount only in limited circumstances, and only after making certain required findings. (§ 4057; *In re Marriage of McHugh* (2014) 231 Cal.App.4th 1238, 1245.) "Determining the amount of child support therefore is a highly regulated area of the law, and the only discretion the trial court has is the discretion conferred by statute or rule." (*McHugh*, at p. 1245.)

A crucial component in the formula is timeshare: the "approximate percentage of time that the high earner has or will have primary physical

11

responsibility for the children compared to the other parent." (§ 4055, subd. (b)(1)(D).) As the timeshare of the higher income earner increases, the guideline amount of child support decreases. Here, the facts are undisputed: the court used a 29 percent timeshare for Father, during a period of time when Father was not seeing Child at all, and had no "physical responsibility" for him because Child was refusing all contact with Father. By disregarding these facts in calculating child support, the trial court failed to comply with the statutes governing this highly regulated area of the law, and therefore abused its discretion. (See § 4057 [statutory guideline formula is presumptively correct]; § 4055, subd. (b)(1)(D) [statutory guideline formula includes timeshare component]; see also § 4053, subd. (c) ["The guideline takes into account each parent's *actual* . . . level of responsibility for the children."], italics added.)

The trial court did not identify a valid legal or factual basis for using something other than Father's actual timeshare in calculating child support. In limited circumstances, the trial court has discretion to allocate a different timeshare to a parent even though the child is not in that parent's actual physical care. Those cases typically arise when the minor child is not in the physical presence of either parent. (See, e.g., *DaSilva v. DaSilva* (2004) 119 Cal.App.4th 1030, 1034 (*DaSilva*) ["Timesharing has been credited to parents having full responsibility for the physical situation and care of a disabled adult child [citation], and may also include the time spent during court-ordered 'grandparent's visitation (§ 3103, subd. (g)(1)), as long as that parent is responsible for the child during that time.' "]; *In re Marriage of Katzberg* (2001) 88 Cal.App.4th 974, 981-983 [court properly allocated all of the time that the parties' son was away at boarding school to the father, who was the primary custodial parent and who would be responsible for any

12

emergencies that arose]; *In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 145 [rejecting father's claim that he should receive credit for part of child's time in day care, stating: "It is the custodial spouse who, after all, has the burden of finding, arranging and fronting the money for appropriate day care, who must deliver and pick up the child, and whose work day will be interrupted if there are any medical or other emergencies."].) These authorities are inapposite here because Child was with Mother (not a third party) and she had physical responsibility for Child's care at all times.[9]

The trial court calculated child support using a 29 percent timeshare for Father in response to Mother's perceived interference with Father's reunification efforts and visitation rights, effectively applying an equitable credit in Father's favor to offset Mother's purported interference. This was error. The law is well-settled that one parent's interference with the visitation rights of the other does not affect the duty of support. (§ 3556 ["The existence or enforcement of a duty of support owed by a noncustodial parent for the support of a minor child is not affected by a failure or refusal by the custodial parent to implement any rights as to custody or visitation granted by a court to the noncustodial parent."].) Our Supreme Court in

---

[9]    Even if these authorities were applicable, allocating a 29 percent timeshare to Father would not be supported by an examination of the relevant factors typically considered in such situations. (See *DaSilva*, *supra*, 119 Cal.App.4th at pp. 1034-1035 ["[I]f a parent desires credit for time the child is not physically with him or her, then the parent has the burden of producing admissible evidence demonstrating he or she is primarily responsible for that child during those challenged times. Relevant factors include: (1) who pays for transportation or who transports the child; (2) who is designated to respond to medical or other emergencies; (3) who is responsible for paying tuition (if any) or incidental school expenses; and (4) who participates in school activities, fundraisers, or other school-related functions."].)

*Moffat v. Moffat* (1980) 27 Cal.3d 645, 651-652 (*Moffat*), made clear that a parent must pay child support even if the custodial parent interferes with the paying parent's right to visitation. The Court held that "the enforcement of child support orders shall not be barred by the contumacious behavior of a party to a dissolution proceeding." (*Id.* at p. 653.) Recognizing the perceived inequity from the paying parent's perspective, the Court nonetheless explained: "Regardless of whether we might view this as an unjust result from the noncustodial parent's point of view, in such circumstances the child's need for sustenance must be the paramount consideration." (*Id.* at p. 651.) The Court reiterated these principles in *In re Marriage of Comer* (1996) 14 Cal.4th 504, 517, stating that, the "denial of rights to custody and visitation does not affect a parent's obligation to provide child support" because "a child support obligation '. . . runs to the child and not the parent.' " (*Ibid.*; see also *Williams v. Williams* (1970) 8 Cal.App.3d 636, 640 ["In essence, the parent, to whom such support is paid, is but a mere conduit for the disbursement of that support."].) Indeed, "[e]ven deliberate sabotage of visitation rights does not justify withholding payment of support." (*Cooper v. O'Rourke* (1995) 32 Cal.App.4th 243, 246 (*Cooper*); see also *In re Marriage of Anderson* (1981) 125 Cal.App.3d 553, 559 ["denial or frustration of visitation rights does not justify termination or reduction of child support payments"]; *In re Marriage of Condon* (1998) 62 Cal.App.4th 533, 548, fn. 10 ["We recognize in an ordinary domestic child custody case the supporting parent's duty to pay child support remains even if the other parent fails to obey the custody and visitation provisions of the court's order."].)

The trial court here was understandably concerned about Mother's role in frustrating Father's visitation rights and interfering with his relationship with Child. A parent's interference with the other parent's visitation rights

"may provide grounds for a contempt action, for modification of custody, or for other sanctions." (*Cooper, supra,* 32 Cal.App.4th at p. 246; see also *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 36, fn. 6 [" 'Conduct by a custodial parent designed to frustrate visitation and communication may be grounds for changing custody.' "]; *In re Marriage of Ciganovich* (1976) 61 Cal.App.3d 289, 294 ["[A] mother's sabotage of the father's visitation right furnishes no ground for withholding child support payments. It does provide a ground for a motion to modify the decree which the court should consider as part of the array of circumstances affecting custody and support."].) But as recognized by a leading treatise, "the court *cannot* modify child support simply to coerce the custodial parent into compliance with the other parent's visitation rights or to penalize the custodial parent for 'interfering' with the other parent's visitation rights." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2020), ¶ 17:68.)[10]

---

[10]  At the custody hearing in family court, the court described Mother's actions as "horrific." In its final order, the court found that "[Child] was estranged from his Father. However, the Court is unclear whether the estrangement was caused by intentional actions by Mother." At the child support hearing in the Family Support Division, the court concluded there was "substantial evidence of Mother's earlier interference in [Child's] relationship with his Father," and did not want "to award Mother's specific behaviors that contributed greatly to the estrangement." We do not condone a parent's interference with court-ordered visitation. Regardless of who is responsible, the child here has undoubtedly suffered as a result of the deterioration in his relationship with Father. The trial court indicated it was balancing Mother's actions "against the needs of [Child] in setting this order for months that have long passed." But the appropriate remedies do not include reducing the noncustodial parent's timeshare to an amount unsupported by the record. (See *Lass v. Eliassen* (1928) 94 Cal.App. 175, 179 ["Rules of equity cannot be intruded in matters that are plain and fully covered by positive statute."].) Terminating or modifying child support by arbitrarily adjusting a parent's timeshare is contrary to the best interests of the child who is generally entitled to guideline child support. The fact that

15

Mother discusses two additional points in her brief. First, she contends the trial court cannot rely on the " 'concealment defense' " to support its child support order. The trial court did not rely on this theory to calculate support, and it has no application here in any event. (See *In re Marriage of Damico* (1994) 7 Cal.4th 673, 676, 683 [a parent who has concealed a child until the minor reaches adulthood may be estopped from seeking child support arrearages because concealment, unlike even extreme interference with visitation rights, "defeats the entire purpose of the [support] order, which is to provide support to a third party, the child"].)[11] Second, Mother contends the support award cannot be justified under the " 'special circumstances' " exception. (§ 4057, subd. (b)(5) [the presumptive correctness of the guideline child support amount may be rebutted by evidence showing application of the formula would be unjust or inappropriate due to special circumstances in the particular case]; see *In re Marriage of Rodriguez* (2018) 23 Cal.App.5th 625, 636 [a trial court has broad discretion to determine when special circumstances apply]; but see *In re Marriage of Wood* (1995) 37 Cal.App.4th 1059, 1069 [courts are not allowed to adjust the guideline calculation under § 4057, subd. (b)(5) if a statute expressly forbids consideration of the requested factor in determining child support], disapproved on other grounds in *In re Marriage of Fellows* (2006) 39 Cal.4th 179, 187.) Although the court alluded to " 'special circumstances' " under section 4057 when setting an interim support order in May 2017, there was

_____

several months passed before final support orders were made does not provide any basis for disregarding the guideline formula.

[11] The judge handling the custody hearing recognized this defense does not apply here. The court "decline[d] to make concealment findings," and "note[d] there is no evidence showing Mother sequestered or concealed the child from Father under [the] *Damico* [case]." The commissioner calculating child support similarly made no findings of concealment in this case.

16

no reliance on (or mention of) section 4057 in the final support order from which this appeal lies. We therefore need not address this issue.

In sum, the law is well-settled that a court is prohibited from terminating or otherwise using child support as a way to penalize or secure the cooperation of a parent who is allegedly frustrating or interfering with the obligor parent's custody or visitation rights. The trial court utilized a 29 percent timeshare, but it is undisputed Father did not have primary physical responsibility for Child 29 percent (or anywhere close to that amount) of the time. Calculating child support in this manner is tantamount to withholding child support and is inconsistent with the governing law in this highly regulated area. (§ 3556; *Moffatt, supra,* 27 Cal.3d at p. 651.) Because there is no valid legal or factual basis to support application of a 29 percent timeshare for the disputed time period, we must reverse the support award. (*S.P., supra,* 4 Cal.App.5th at p. 934.)

## II.

### *Income Determination*

Mother challenges the trial court's refusal to include certain payments Father received from his parents as income available for child support. We find no abuse of discretion in the court's conclusion that the gifts here did not amount to income available for child support. (See *Simpson, supra,* 4 Cal.4th at p. 234 [child support orders are reviewed for an abuse of discretion]; *In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1312 (*Williamson*) [under the abuse of discretion standard, the appellate court "will disturb the trial court's decision only if no judge could have reasonably made the challenged decision"]; see also *In re Marriage of Wittgrove* (2004) 120 Cal.App.4th 1317, 1327 [we review factual findings made in connection with a child support ruling under the substantial evidence test].)

17

A. *Additional Factual Background*

Throughout the support litigation, Father submitted income and expense declarations identifying the amount of attorney fees he incurred.[12]

In March 2017, Father submitted a declaration explaining that his parents were paying his attorney fees by putting them on a credit card. Father stated his parents intended to deduct these payments from his future inheritance.

At a deposition in May 2018, Father testified that his parents had previously paid his attorney directly, but they had stopped making payments as they were unhappy with the results being achieved in the custody battle, since Father "technically" already had 50 percent custody but such custody was "not being enforced."[13]  He testified he had not paid his family law attorney in "at least two" years and stated his parents had paid "[o]ver a hundred thousand [dollars in attorney fees that] [he] kn[e]w [of]."

In November 2018, Father stated his parents had previously paid his attorney fees by putting them on a credit card, but that they were no longer " 'able to help' " and the fees paid would be deducted from his future inheritance.  In later testimony, he acknowledged making this statement, but

---

[12]    In December 2017, Father attested he had paid his attorney $239,393.00, using "credit card/income" and still owed $9,389 in fees.  In July 2018, Father attested he had paid his attorney $55,000 in the last 12 months with "income/credit card" and still owed approximately $6,700 in fees.  In November 2018, Father attested he had paid $96,474.39 in attorney fees between October 2016 and November 2018 with "[l]oans and income" and still owed nearly $2,000 in fees.

[13]    Father explained that his parents paid his attorney "directly, not through [Father]," and he "never saw the bill," "never saw the credit card." Father did not receive the attorney's monthly bills; they were sent directly to his parents for payment.

also stated he was "not aware of what the inheritance is or if there is one" because he did not discuss the matter with his parents.

In January 2019, Mother filed a declaration in anticipation of the final evidentiary hearing on child support. In her declaration, she stated that Father's income and expense declarations admitted as evidence in the family court proceedings reflected Father's receipt of recurrent monetary gifts of attorney fees paid by Father's parents. She further declared that, at the custody hearing, Father was cross-examined on his income and Father's mother was cross-examined regarding her contribution to Father's attorney fees. According to Mother's declaration, Father acknowledged under oath that his parents assisted him with attorney fees, and claimed that, as of November 19, 2018, his attorney had been paid $69,464.39 over the prior two years. Mother's declaration posited her belief that Father's parents had in fact paid over $210,000 in attorney fees throughout the litigation. During the December 2018 hearing on custody, the court confirmed that Father's "parents have assisted him with his attorney's fees. As of November 19, 2018, he has paid his attorney $69,474.39 [*sic*]." Based on the record before us, the court did not confirm Mother's additional claim that his parents paid over $210,000 in attorney fees.

Mother requested that the court consider the attorney fee payments Father received from his parents as gifts includable in Father's income pursuant to *In re Marriage of Alter*.[14] The court declined to do so, stating, "My tentative is, no. *Alter* doesn't cover that. [¶] . . . [¶] I don't see those facts here." Ultimately, the court "decline[d] to add income for Father for any

---

14   *In re Marriage of Alter* (2009) 171 Cal.App.4th 718 (*Alter*) is discussed further *post*.

19

gifts he may have received from his parents for attorney's fees . . . and . . . decline[d] to add it to Father's [income]."

B. *Applicable Law*

For purposes of the guideline child support calculation, the annual gross income of a parent "means income from whatever source derived . . . and includes, but is not limited to, the following:  [¶]  (1) [i]ncome such as commissions, salaries, royalties, wages, bonuses, rents, dividends, pensions, interest, trust income, annuities, workers' compensation benefits, unemployment insurance benefits, disability insurance benefits, social security benefits, and spousal support actually received from a person not a party to the proceeding to establish a child support order under this article[,] [¶]  (2) [i]ncome from the proprietorship of a business, such as gross receipts from the business reduced by expenditures required for the operation of the business[, and]  [¶]  (3) [i]n the discretion of the court, employee benefits or self-employment benefits, taking into consideration the benefit to the employee, any corresponding reduction in living expenses, and other relevant facts."  (§ 4058, subd. (a).)

"[N]othing in the law prohibits considering gifts to be income for purposes of child support so long as the gifts bear a reasonable relationship to the traditional meaning of income as a recurrent monetary benefit."  (*Alter*, *supra*, 171 Cal.App.4th at pp. 736-737.)  "But while regular gifts of cash may fairly represent income, that might not always be so.  Therefore, the question of whether gifts should be considered income for purposes of the child support calculation is one that must be left to the discretion of the trial court."  (*Id.* at p. 737)

C. *Analysis*

Mother contends the facts here are "factually analogous to *Alter* in that [Father's] parents provided substantial cash gifts over the period of 2015-2019 that were of a 'periodic and regular nature.' " We disagree.

In *Alter*, the father had been receiving regular cash payments from one of his parents for over a decade—the payments were periodic and regular in nature, such that the money was available to the father for the support of his children. (*Alter*, *supra*, 171 Cal.App.4th at p. 737.) Under these circumstances, the Court of Appeal determined the trial court did not abuse its discretion in considering the $6,000 per month that father regularly received as a gift to be part of his income for purposes of calculating child support. (*Id.* at pp. 731, 737.)

By contrast, in *Williamson*, the Court of Appeal held that certain gifts from father's parents were not includable in father's income available for support. (*Williamson*, *supra*, 226 Cal.App.4th at p. 1313.) The evidence established that the father had received lavish gifts and cash advances to purchase and renovate the family home and for the family's living expenses. (*Id.* at p. 1314) The payments were made upon request and were irregular. In some years, the father received large sums of cash, but in other years, he received none. (*Ibid.*) Under these circumstances, the Court of Appeal held that including the value of the gifts as part of the father's income would lead to a child support order based on money that the father did not have. (*Id.* at p. 1313.)

There is substantial evidence in the record to support the trial court's conclusion that *Alter* does not apply, and this case is more like *Williamson*. Unlike *Alter*, where the grandparents had made regular payments even before the divorce proceedings, and continued providing regular cash

21

payments to the father after the parties' separation, the payments here were made for a discrete purpose and they have since ceased. The parties were embroiled in an extended custody dispute, with Father contending that Mother was interfering with his visitation rights. Father's parents directly paid for his attorney so Father could obtain necessary representation during this dispute, then stopped paying when they could no longer afford to pay and became dissatisfied with the results. Mother has not established that the payments were made at regular time intervals or in recurring amounts; she also contends Father's parents paid a total amount that is significantly higher than the amount stated by the trial court. And the payments were for a specific purpose—Father's attorneys—and are not available to Father for the support of Child. (See *M.S. v. O.S.* (2009) 176 Cal.App.4th 548, 560 [holding that trial court erred when it characterized as income an Indian tribe's direct payment of the obligor father's attorney fees, where the tribe paid the attorneys directly, and thus "the payments are not part of [the father's] regular income or included in his cashflow"]; *Anna M. v. Jeffrey E.* (2017) 7 Cal.App.5th 439, 449 (*Anna M.*) ["a child support award should usually not be based on monies the parent does not actually have available for support"]; *id.* at p. 454 [cash gifts not considered income when provided "on an as-needed basis to pay particular expenses"].) As the court stated in *Williamson*, "[g]enerous relatives do not have a duty to support a family member's minor children." (*Williamson*, *supra*, 226 Cal.App.4th at p. 1315.)

On this record, we conclude the trial court did not abuse its discretion in rejecting Mother's claim that Father was receiving the type of recurring and regular monetary gifts that may be treated as income under section 4058. (*Alter*, *supra*, 171 Cal.App.4th at p. 737 ["the question of whether gifts should be considered income for purposes of the child support

22

calculation is one that must be left to the discretion of the trial court"]; *Williamson*, *supra*, 226 Cal.App.4th at p. 1314 [trial court did not err in concluding payments "were irregular and outside 'the traditional concept of income as a recurrent, monetary benefit' "]; see also *Anna M.*, *supra*, 7 Cal.App.5th at p. 452 ["legal authorities . . . indicate regular, recurrent gifts to a parent may be characterized as income to that parent for purposes of calculating guideline child support, but they do not indicate gifts *must* be so characterized in every case"].)

## DISPOSITION

The order is reversed in part.  The matter is remanded to the trial court to recalculate the guideline amount of child support owed by Father for the time period of August 2015 through October 2017, based on Father's actual timeshare during this period of time.  In all other respects, the order is affirmed.

GUERRERO, J.

WE CONCUR:

BENKE, Acting P. J.

O'ROURKE, J.

23

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SAN DIEGO, | D075690 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. DN143198) |
| P.B., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Respondent; | |
| L.C., | |
| Defendant and Appellant. | |

THE COURT:

The opinion in this case filed October 8, 2020, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

BENKE, Acting P. J.

Copies to:  All parties

2